CLERKS OFFICE US DISTRICT COURT
AT ABINGDON, VA
FILED
10/20/2025
LAURA A. AUSTIN, CLERK
BY: /s/ Kendra Campbell
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | |
|---|---|
| **JANET BRIGHT,** | ) |
| Plaintiff, | ) |
| v. | ) Case No. 1:25cv65 |
| **MICHELE BROOKS,** *in her individual and official capacities*, | ) JURY TRIAL DEMANDED |
| and | ) |
| **LEE COUNTY DEPARTMENT OF SOCIAL SERVICES,** | ) |
| Defendants. | ) |

## COMPLAINT

COMES NOW the plaintiff, Janet Bright, and states as follows for her Complaint against the defendants, Michele Brooks and Lee County Department of Social Services.

### JURISDICTION AND VENUE

1. Jurisdiction exists in this case pursuant to the First Amendment to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331 and 1343.

2. This Court has pendent and supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 as the events underlying this action occurred within the jurisdiction of the United States District Court for the Western District of Virginia, Abingdon Division.

4. Ms. Bright is a resident of Lee County, Virginia.

1

5.      The Lee County Department of Social Services ("Lee DSS" or "Lee County DSS") receives federal and state tax funds and operates as a local office of the Virginia Department of Social Services serving the communities of Lee County.

**FACTS**

6.      Lee County DSS employed Ms. Bright as the Children's Services Act ("CSA") Coordinator and leader of the Family Assessment Planning Team beginning in December 2019.

7.      Bright's sister, Julie Johnson, was also an employee of Lee County DSS for at least 25 years, serving as the Foster Care Supervisor.

8.      At all times relevant, Michele Brooks was the Director of Lee DSS, and Emily Crawford was the CPS Supervisor.

9.      As a Family Services employee, Bright is a mandatory reporter of child abuse and neglect under Virginia law.  See Va. Code § 63.2-1509(A).

**Statutes and Regulations Governing Local Branches of VDSS**

10.     The Virginia Department of Social Services ("VDSS") partners with local departments of social services ("LDSS"), which deliver benefits and "family services" programs in local communities.

11.     Family services are administered by Family Services Specialists, who authorize payments to individuals and vendors for services, and provide direct services to individuals.

12.     The Child Protective Services ("CPS") program, a division of family services, is responsible for the identification, receipt of, and immediate response to valid reports of alleged child abuse or neglect of children. The CPS program includes assessment and arranging for or providing necessary protective and rehabilitative services for a child and their family when the child has been identified as abused or neglected or is at risk of future maltreatment.

13. Lee County DSS is an LDSS, which provides CPS services under the supervision of the VDSS as authorized by Virginia Code § 63.2-1501.

14. Under Virginia law, Lee County DSS must maintain the ability to receive and respond to reports alleging abuse and neglect of children. See Va. Code § 63.2-1503.

15. Upon receipt of a report of child abuse or neglect, Lee DSS must determine the validity of such report and either conduct an investigation pursuant to § 63.2-1505, or a family assessment pursuant to § 63.2-1506. See Va. Code §63.2-1503(I).

16. Regulations governing the investigation and family assessment reside in Title 22 of the Virginia Administrative Code.

17. VDSS has also produced a *Child and Family Services Manual*, which provides direction and policies for LDSS providing CPS services in their jurisdictions.

18. As such, the *Child and Family Services Manual* is a "formally adopted code of conduct . . . designed to protect the interests of the public." See Va. Code § 2.2-3010.

19. Chapter C of the *Child and Family Services Manual* ("Manual") is devoted to the CPS Program and is available online at https://www.dss.virginia.gov/family/cps/manuals.cgi.

20. A CPS investigation consists of a safety assessment, a risk assessment, a determination of the validity of the report of abuse, and if determined valid ("founded"), a designation of abuse as Level 1, 2, or 3, with Level 1 being the most severe. See 22 V.A.C. 40-705-110.

21. The safety assessment is ongoing; it is part of the initial assessment, and a CPS worker must continue to gather safety information from that point until the case is closed. See *Manual*, Ch. C, Section 4.5.13.

3

22. The Manual directs that "the LDSS must complete the process of an initial safety assessment at the first meaningful contact with the family *and any time safety changes* and document the results in the CPS Safety Assessment Tool in the child welfare information system within 24 hours of the first meaningful contact or any time safety changes." See *Manual*, Ch. C, Section 4.5.8.2 (emphasis added).

23. According to the Manual, a caretaker's drug and/or alcohol involvement is a major issue in the safety assessment. See *Manual*, Ch. C, Section 4.5.10, 4.5.16.

24. As such, an LDSS is required to develop guidelines for evaluating substance or drug abuse. See 22 V.A.C. 40-705-90(D)(1).

25. Following such guidelines, when a CPS worker has reason to believe that a caretaker of a child who is the subject of a valid report of child abuse or neglect is abusing substances, the worker may request that the caretaker undergo a drug test or petition the court to order such screening. See 22 V.A.C. 40-705-90(D).

26. If the safety assessment reveals that the child's safety is at issue, the CPS worker develops a "safety plan," "an immediate course of action designed to protect a child from abuse or neglect." 22 VAC 40-705-10.

27. The Manual notes that a possible component of a safety plan would be for a caretaker to commit to "[r]efrain from the use of any illegal drugs or substances while caring for the child(ren)." See *Manual,* Ch. C, Section 4.5.12.2.

28. Safety plan conditions remain in effect until a new safety plan is developed; a service plan is developed; or the family assessment or case is closed, whichever comes first. See *Manual,* Ch. C, Section 4.5.12.2.

4

29.     According to the Manual, a child's safety must be consistently reassessed, particularly when a CPS worker notes "[a] change in ability of safety interventions to mitigate safety factors." *Manual*, Ch. C, Section 4.5.13.

30.     Thus, when a CPS worker receives information that a safety plan is not working, "the safety plan should be reviewed and revised" or a Family Partnership Meeting should be scheduled. *Manual,* Ch. C., Section 4.5.13.

**Statutes Governing Lee County's Community Policy and Management Team**

31.     Provision of services to children, families, and other at-risk Virginia residents requires interagency cooperation, particularly to disperse funding where it is most effective at the local level.

32.     To receive state funding under the Children's Services Act (CSA or "the Act"), localities establish a "Community Policy and Management Team" or "CPMT." Va. Code § 2.2-5204. See also 22 V.A.C. 40-201-10.

33.     The CSA is a state-supervised, locally administered system.

34.     The State Executive Council for Children's Services (SEC, Va. Code §2.2-2648) and its administrative agency, the Office of Children's Services (OCS, Va. Code §2.2-2649), are responsible for oversight of the CSA following all relevant federal and state laws, regulations, and the policies of the SEC.

35.     The Office of Children's Services is charged with developing and providing consistent oversight of program administration and compliance with state law, policies, and procedures defined in the statute. This CSA User Guide is one mechanism through which the Office of Children's Services meets these responsibilities. See https://www.csa.virginia.gov/content/doc/CSA_User_Guide.pdf. Another, the CSA Policy

5

Manual, provides a comprehensive resource regarding specific policies adopted by the State Executive Council for Children's Services (SEC) for the administration of the CSA. See https://www.csa.virginia.gov/content/doc/CSA_User_Guide.pdf.

36. As such, these two publications are "formally adopted code[s] of conduct . . . designed to protect the interests of the public." See Va. Code § 2.2-3010.

37. Local CPMTs have a number of statutory responsibilities including the following fiscal responsibilities: "Develop interagency fiscal policies governing access to the state pool of funds . . . [e]stablish quality assurance and accountability procedures for program utilization funds management . . . [m]anage funds in the interagency budget allocated to the community from the state pool of funds . . . [and] [a]uthorize and monitor the expenditure of funds by each family assessment and planning team . . ." Va. Code § 2.2-5206.

38. CPMTs are statutorily obligated to "establish and appoint one or more family assessment and planning teams [(FAPT)]. . . [which] shall include representatives of [] community agencies who have authority to access services within their respective agencies." Code § 2.2-5207.

39. Va. Code §2.2-5206.3 and §2.2-5208 require the CPMT to establish and the FAPT to implement policies to have parents/guardians of children receiving CSA-funded services contribute financially to the cost of such services, except when prohibited by law or regulation (e.g., for special education services per an IEP). See also Va. Code §63.2-1910 (parental contributions for foster care).

40. The Appropriation Act specifies that the CPMT shall enter into formal agreements with parents or legal guardians to secure financial contribution and that the OCS shall be a party

6

to any such agreement. See Chapter 836, 2017 General Assembly Session, Item E, online at https://budget.lis.virginia.gov/get/budget/3279/.

41. Va. Code §2.2-5212 identifies populations eligible for CSA funding.

42. Any alternate government funding sources to which a child is entitled must be used to reimburse the state funds received through CSA for services and support provided to the child. See *CSA User Guide* 7.2-7.3, ref. Va. Code § 2.2-5211(D).

43. Thus, when CSA funds are used to pay for services or support for children receiving services or in foster care, parental contributions or funds from other government sources such as social security must be received by local CPMTs and used to reimburse CSA funds. See *CSA Manual* 4.5.2 ("Localities shall adopt and implement procedures to reconcile actual CSA reimbursements against expected reimbursements . . .")

44. In 2018, Lee County CPMT completed a self-audit of the CSA funding it received.

45. When Bright came onboard with Lee DSS in December 2019, she became the Family Assessment Planning Team Leader in the CPMT and also served as the CSA Coordinator.

46. Due to her role on the CPMT, Bright became the point of contact when the Office of Children's Services (OCS) evaluated Lee County's 2018 self-audit. In response to OCS inquiries, Bright discovered that funds paid from other sources on behalf of children in Lee County foster care were not being used to reimburse CSA for foster care costs, but rather, were deposited in an unnamed Lee County account.

47. Bright also identified situations where a child receiving DSS services and support also received Social Security funds, but the funds were not used to reimburse CSA. Rather, they

7

were deposited into a special welfare account in the child's name, making the child (due to her bank balance) ineligible for Medicaid.

48. Bright reported her findings to OCS that Lee County had mismanaged state and federal funds in violation of CSA Policies.

49. In March 2021, the OCS concluded its assessment of the 2018 self-audit, finding significant "[n]on-compliance with statutory requirements." The OCS concluded that the Lee County CPMT "is not operating fully in accordance with the laws of the Commonwealth." See letter, online at https://www.csa.virginia.gov/Content/doc/Lee_County_Final_Report_2020.pdf.

50. With regard to financial controls, the assessment mandated that "[p]rior to authorizing funding, the CPMT should ensure that the proposed expenditure meets the criteria for CSA funding and/or other appropriate funding sources, [and that] [a]dequate documentation, such as but not limited to original receipts should be maintained as justification for CPMT funding decisions." See letter, *supra*.

51. As a result of the State's findings, Lee County CPMT was required to "submit a quality improvement plan to address the observations outlined in the report." See letter, *supra*.

52. Significantly, the program auditor "acknowledge[d] the assistance provided by Janet Bright, CSA Coordinator during our review."

### Problems with Lee County CPMT Fiscal Controls Continue

53. Even after the State audit results, Lee DSS Director Brooks would frequently order Bright to make improper payments for "expenditures [which did not] meet the criteria for [state funding]."

54. For example, Brooks instructed Bright to pay police officers for supervision and transportation of children under Lee DSS' care.

8

55. She also ordered Bright to pay the Lee County Sheriff's Department, even though the CPMT had not approved the payment.

56. Throughout 2022 and 2023, Bright repeatedly raised issues of Lee DSS financial mismanagement in CPMT meetings, referencing the findings in the state audit, and cited the above particular instances of expenditures which would likely subject Lee County to another state audit and possible loss of funding.

57. In the first quarter of 2023, Bright called a meeting with the County Treasurer, the County Administrator, the LDSS Director and Office Manager and the CPMT Chair to discuss Lee County's noncompliance with CSA child support reimbursement requirements.

58. As a CPMT member, Bright consistently and vocally advocated for fiscal responsibility and statutory compliance and reported specific instances of non-compliance and violation of Virginia statutes and policies established by CPMT.

### Child Endangerment and Bright's Appeal to the Ombudsman

59. In October 2022, Lee County DSS initiated a neglect case against J.F., the mother of a two-year old child. A CPS investigator found that the child had been physically neglected.

60. Bright was not the caseworker assigned to J.F. and her child, and she had no responsibility for DSS' relationship with this family through her role as a DSS employee.

61. At the time of the CPS investigation, both the mother and child tested positive for marijuana.

62. The child became the subject of a "safety plan" issued December 12, 2022, which required that the mother "refrain from smoking marijuana or [doing] any other drugs in . . . the presence of the child." See *Manual* 4.5.9.

63. Under this safety plan, the CPS worker was required to "administer drug screens" under a protective order.

64. Shortly thereafter, the child tested positive for marijuana, amphetamines, and methamphetamine.

65. As a result of the continued and worsening exposure of the child to the mother's drug use, Lee DSS issued a second safety plan on December 21, 2022, under which the child's grandparents agreed to "care for [the child] and be responsible for him at all times until further notice" and to "supervise [the child] with [the mother] at all times until further notice."

66. As in the first safety plan, the CPS worker was required to "continue to administer drug screens."

67. Shortly thereafter, Lee DSS petitioned the court for a preliminary protective order. At the hearing, the court found that J.F.'s child suffered from neglect and entered the order on January 5, 2023.

68. At the time the order was entered, the court also set a dispositional hearing for March 9, 2023, in accordance with Va. Code § 16.1-253(G).

69. On March 1, 2023, the child again tested positive for amphetamines and methamphetamine, and the test showed an increase of those levels from December to March.

70. Bright was aware of the test results because multiple children and parents were tested on the same day, Lee DSS received the results in a batch on March 5, and other case workers in the office reported that J.F. and her child's drug tests came back positive.

71. Jason Goforth, a Lee DSS CPS worker, also knew about the positive drug test results, including the recent March 2023 test, but when he appeared in court in the matter on March 9, he did not provide any information about the positive drug tests.

10

72. Without the drug screen information, the court did not remove the child from the home.

73. On March 13, 2023, Lee County DSS initiated a third safety plan which required J.F. to "not have [the child] in the presence of [her boyfriend] until further notice."

74. On April 20, 2023, concerned for the safety of the two-year-old, Bright emailed Director Brooks and Supervisor Crawford about Goforth's knowledge and his failure to report the positive drug test. Bright also noted that J.F. and the child's grandparents were in violation of the December 21 safety plan because the mother was alone with the child while the grandparents worked. Finally, Bright noted that the initial assessment by the Family Assessment Planning Team "indicates founded level 2 for physical neglect and inadequate supervision."

75. Brooks took no action on the report.

76. Crawford dismissed Bright's concerns, recognizing that (in violation of the March 13 safety plan) the boyfriend had been living with the family since his release from jail, and that perhaps he had played with the child outside and some of the boyfriend's drug-laced sweat had dripped on the child.

77. Bright protested that the child had three positive drug tests in a row with worse results each time.

78. On May 8, 2023, the child again tested positive for methamphetamine.

79. On May 16, 2023, J.F., her new husband, the child's uncle, and the child's grandparents participated in a family partnership meeting with Director Brooks, Supervisor Crawford, and two other DSS workers.

80.     The meeting summary report mentioned drug tests in December 2022 and May 2023, but did not report the October 2022 or March 2023 tests, the latter of which was not reported to the court either.

81.     With no recourse within her office to secure the safety of the child, Bright called the Office of the Children's Ombudsman in Richmond and reported the situation to Mike Reynolds on June 19, 2023.

82.     The Office of the Children's Ombudsman (OCO) was established in part to investigate and review actions of LDSS and to monitor and ensure compliance with relevant statues, rules, and policies pertaining to child protective services. See Va. Code § 2.2-439.

83.     As a mandatory reporter, Bright was entitled to "make a complaint to the Ombudsman with respect to a particular child" to the Ombudsman. See Va. Code § 2.2-441.

84.     Under Virginia law, Lee DSS may not "penalize any person for filing a complaint or cooperating with the Ombudsman in investigating a complaint." Va. Code § 2.2-448(A).

85.     Shortly after her initial report, while physically present in the Lee DSS office, Bright received a phone call from the Ombudsman's office confirming her agreement to provide recorded testimony to a group of attorneys on June 29, 2023.

86.     Upon information and belief, another CPS employee overheard Bright's phone call and reported it to Director Brooks.

**Julie Johnson's Medical Issues and Request for Accommodation**

87. In early 2022, Johnson, Bright's sister, had to take medical leave due to medical issues which required her to have a feeding tube 24 hours per day for several months.

88. Johnson requested FMLA leave, as well as the accommodation of working from home, as many DSS staff did during COVID.

89. Lee DSS Human Resources denied Johnson's request and failed to enter into any meaningful dialog with Johnson about another suitable accommodation.

90. Allowing a single staff member to work remotely was not a significant hardship for Lee DSS, as all staff members had worked remotely during the COVID-19 pandemic.

91. On May 8, 2023, Bright informed Tracy Reece, Lee DSS Office Manager, that failing to accommodate her sister was a violation of the FMLA and the employer's duty to accommodate under the ADA.

92. In May 2023, Johnson came back to the office for a short time, and during that time, Director Brooks asked her to resign.

93. Lee DSS requested Johnson's resignation purportedly because she had used all her available sick leave and donated leave time.

94. Johnson declined to resign, and later that month, she submitted a request for FMLA leave. More than a month later, she received a notice by certified mail from the attorney for Lee DSS, dated June 30, 2023, stating she was ineligible for FMLA leave because she had not worked enough hours in the preceding 12 months.[1]

---

[1] The FMLA and its implementing regulations provide that notice of eligibility must be provided within five business days of receipt of a request for FMLA leave, so this very late notification was itself unlawful.

13

95. Not physically able to return to the office and having been denied FMLA leave and the reasonable accommodation of working from home, Johnson decided to retire and claim disability benefits.

96. On June 12, 2023, Johnson's access to DSS computer logins, email and applications was "suspended," but in July 2023, Director Brooks agreed to keep Johnson on "leave without pay status" so that she could continue to purchase insurance through DSS.

97. On August 28, 2023, Johnson's key card was "deleted," and also during that month, Johnson vacated her DSS office, allowing Bright to move into the space.

98. Johnson's relationship with Lee DSS continued for at least another two months, however, as she retained her DSS laptop and cell phone and continued to answer work-related inquiries from Lee DSS attorneys, supervisors, and co-workers. Johnson continued to purchase insurance through Lee DSS.

99. Moreover, Johnson continued to cover the cost of her DSS health insurance policy through November 2023, by reimbursing Lee DSS for her insurance premiums.

**Bright's report to Richmond**

100. On June 29, 2023, Bright participated in an hour-long phone call with a group of attorneys as a result of her Ombudsman report.

101. In that phone call, Bright reported Goforth's failure to notify the court of repeated positive drug tests, Lee DSS leadership's knowledge of that omission, and the leadership's failure to address and/or remedy the situation.

102. While on the call with the Ombudsman, Bright also reported, in good faith, actions of Lee DSS towards Johnson, which she believed violated the Family Medical Leave Act and the ADA's accommodation mandate.

14

**Lee DSS finds a pretextual reason to terminate Bright's employment**

103. With full knowledge of Bright's report to the VDSS office in Richmond, Director Brooks and Lee DSS looked for a way to terminate her employment.

104. Bright was a competent and reliable employee who consistently met or exceeded her employer's legitimate expectations.

105. She had never received any written discipline and had never been put on a performance improvement plan.

106. As such, there was nothing in Bright's performance of her job which merited dismissal or even discipline.

107. Nonetheless, Director Brooks and Lee DSS watched Bright carefully looking for a "failure" on her part which could substantiate a decision to terminate her employment. Their moment came when Bright returned to the office late one night with Johnson, whose employment status with DSS at that time was unclear.

108. On October 22, 2023, Bright and Johnson entered the Lee DSS office after hours to collect a document from Lee DSS that Johnson needed for the following day, which was believed to have been left for her in Bright's office.

109. Johnson retrieved the document, and Bright made some copies she needed for work the following day.

110. Bright briefly entered the file room, but did not sign herself in at 10:00 pm, as was policy.

111. As Johnson had formerly occupied Bright's office, Johnson took the opportunity to retrieve some personal items she had left in the room.

112.   Johnson wanted to pack up multiple items, and she looked for a box to put them in.

113.   Not finding a box, she grabbed a donated duffle bag from the foster care room to carry her things to the car.

114.   On October 25, 2023, Bright was placed on administrative leave ostensibly because she allowed Johnson, a non-employee, to enter the building after hours and because Johnson "stole" DSS property with Bright's "consent" when she used the donated duffle bag to carry her things to the car.

115.   Director Brooks terminated Bright's employment on November 20, 2023.

### COUNT I: Termination in Violation of the Fraud and Abuse Whistleblower Protection Act ("FAWPA"), Virginia Code § 2.2-3011

116.   Plaintiff incorporates the above paragraphs as if fully restated here.

117.   Lee DSS is an employer as that term is defined in Va. Code § 2.2-3010.

118.   Bright was an employee of Lee DSS as that term is defined in Va. Code § 2.2-3010.

119.   Bright witnessed evidence of violations of federal and state law, regulations, and policies and guidelines formally adopted by VDSS "to protect the interest of the public."

120.   Specifically, Bright witnessed and had evidence of Lee DSS's denial of her sister's reasonable request for accommodation under the ADA, and the discriminatory and retaliatory termination of her sister's employment in violation of the ADA, the FMLA, and the Virginia Human Rights Act, codified at Va. Code § 2.2-3900 *et seq*.

121.   Bright witnessed and had evidence of Lee DSS' failure to comply with state law and policy regarding a locality's use of CSA funding.

122. Bright had evidence of Lee DSS' failure to effectively monitor the ongoing safety of a child in its care, who showed increasing evidence of an unsafe home environment, in violation of the regulations and guidelines governing CPS investigations.

123. Bright had evidence of Lee DSS' failure to communicate to a court deciding on a matter of child endangerment, all pertinent facts about the child's unsafe home environment.

124. Bright witnessed or had evidence of Lee DSS' "substantial misuse [and] waste . . . of resources . . . derived from [CSA] sources."

125. Bright reported each of these instances of wrongdoing or abuse to her supervisors at Lee DSS, the Lee County CPMT, and the Office of the Children's Ombudsman in Richmond, all of which constitute her "superiors . . . or an appropriate authority" under Va. Code § 2.2-3010.

126. Bright's reports were good faith reports, made without malice.

127. Having witnessed directly or received first-hand reports of the conduct she reported, Bright reasonably believed the conduct she reported was true.

128. Bright's knowledge, evidence, and actions make her a whistleblower as that term is defined in Va. Code § 2.2-3010.

129. Lee DSS retaliated against Bright for her whistleblowing and ultimately terminated her employment for a pretextual reason.

**COUNT II: Retaliation under the Constitution of Virginia, Art. I, Sec. 12**

130. Plaintiff incorporates the above paragraphs as if fully restated here.

131. Virginia's protections for free speech are "at least as strong as" those in the U.S. Constitution. *See Vlaming v. West Point Sch. Bd.*, 895 S.E.2d 705, 737 (Va. 2023).

132. Bright engaged in protected activities under the Constitution of Virginia, Art. I, Sec. 12 when she reported to the Ombudsman Lee DSS' failure to prioritize the safety of J.F.'s child, who was the subject of a DSS safety plan.

133. Bright's report to the Ombudsman was not related to her caseload or her role as CSA Coordinator or Family Assessment Planning Team Leader in the CPMT.

134. Bright's decision to report Lee DSS' inaction with regard to J.F.'s family was made out of concern for the welfare of J.F.'s child, not a particular job responsibility that she had.

135. Brooks' and Lee DSS' decision to terminate Bright's employment was based, at least in part, on her report to the Ombudsman.

136. Termination of her employment was an adverse action against Bright which would dissuade a person of ordinary firmness from communicating with the Ombudsman about the welfare of a child receiving DSS services.

137. Termination of Bright's employment was motivated at least in part as a response to her exercise of her protected activities and communications.

138. Brooks and Lee DSS were maliciously, intentionally, or recklessly indifferent to Bright's rights under the Constitution of Virginia, Art. I, Sec. 12, which protected her communication to the Ombudsman.

### COUNT III: 42 U.S.C. § 1983 – First Amendment Retaliation
### Against Michele Brooks in her Individual Capacity

139. Plaintiff incorporates the above paragraphs as if fully restated here.

140. Ms. Bright engaged in protected First Amendment activities outside the scope of her job duties by speaking out about a matter of public concern to third parties including the Ombudsman's office.

141. Ms. Bright's protected activities and communications played at least a part in Brooks's decision to terminate Ms. Bright's employment.

142. Ms. Brooks's termination of Ms. Bright's employment was an adverse action against her that would chill a person of ordinary firmness from engaging in or continuing to engage in protected communications.

143. The adverse action was motivated at least in part as a response to Ms. Bright's exercise of her protected activities and communications.

144. As a result, Ms. Bright was injured.

145. Ms. Brooks was maliciously, intentionally, or recklessly indifferent to Ms. Bright's First Amendment protected right to speak out about a matter of public concern.

### Prayer for Relief

WHEREFORE, Janet Bright demands judgment against Lee County DSS and Michele Brooks, for all appropriate remedies including compensatory and punitive damages, lost wages, back pay, pre- and post-judgment interest, as well as reinstatement to the same position or equivalent position and full reinstatement of fringe benefits and seniority rights, or front pay in lieu of reinstatement, as well as reasonable attorney fees and costs.

JANET BRIGHT<br>
By Counsel

*/s/ Alexis I. Tahinci*
Alexis I. Tahinci
VSB #85996
TAHINCI LAW FIRM PLLC
105 Ford Ave., Suite 3
Kingsport, TN 37663
Ph: (423) 406-1151
F: (423) 815-1728
Alexis@tahincilaw.com
COUNSEL FOR PLAINTIFF